**CHEMICAL WASTE MANAGEMENT, INC., Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

**Civ. A. No. 84–3433.**

United States District Court, District of Columbia.

Oct. 29, 1986.

---

Angus Macbeth, Samuel I. Gutter, Sidley & Austin Law Firm, Washington, D.C., for plaintiff.

Dean K. Dunsmore, United States Department of Justice, Natural Resources Div., Environmental Defense Section, Washington, D.C., for defendants.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiff, Chemical Waste Management, Inc. (CWM), operates, among other facilities, the Denver-Arapahoe Chemical Waste Processing Facility (Denver-Arapahoe or the facility) in Arapahoe County, Colorado. This action was initially brought by CWM asking this court to review and set aside as unlawful a final order of the defendant, the United States Environmental Protection Agency (EPA or the Agency).[1] In that order, the EPA found that CWM had violated Section 3008(a)(1) of the Resource Conservation Recovery Act of 1976, as amended, 42 U.S.C. § 6928(a)(1) (the Act or the RCRA) and the EPA's implementing regulations. The EPA assessed $40,000 in civil penalties against CWM.[2] Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331, and the case is presently before the court on the parties' cross motions for summary judgment.

The principal issues presented to the court in reviewing the action taken by the EPA are whether the administrative record contains substantial evidence to support the decision of the Administrative Law Judge (ALJ) of the EPA as affirmed by the Chief Judicial Officer (CJO) and whether the EPA's interpretation and application of the regulations here in question were proper and in accordance with law. After consideration of the motion of defendant for summary judgment, the supporting and opposing memoranda, and the entire record herein, the court concludes that the defendant's motion for summary judgment must be granted, and plaintiff's motion for summary judgment denied.

## BACKGROUND

### I. *The Regulatory Scheme*

Due to changes in technology, manufacturing processes, and patterns of consumption, the problem of disposing of the nation's waste, both non-hazardous and hazardous, was found by Congress to be a matter of national scope and concern. RCRA § 6901(b). Without careful planning and management, waste disposal presents a danger to human health as well as to the environment. *Id.* Hazardous waste, defined in the EPA's regulations as "any waste or combination of wastes which pose a substantial present or potential hazard to human health or living organisms because they can be lethal or because they may otherwise cause or tend to cause detrimental effects", 40 C.F.R. § 240.010(m) (1985), requires a greater degree of care in handling than non-hazardous waste. RCRA § 6901(b)(5). As a result, the business of hazardous waste storage, treatment, transport, and disposal is highly regulated by both federal and state governments.

Sections 6922 to 6926 of the Act require the EPA to promulgate regulations that establish standards for hazardous waste treatment, storage, and disposal. The EPA has exercised its regulatory authority and the ensuing regulations are codified at 40 C.F.R., Subchapter I, Parts 240 to 271. Under these regulations, owners or operators of hazardous waste treatment, storage, and disposal facilities are compelled to apply for an operating permit issued by the EPA. The applicable regulatory standards must be met by the waste facility prior to

---

**1.** The defendants in this case are the EPA; Lee M. Thomas, Administrator of the EPA; and Ronald L. McCallum, Chief Judicial Officer of the EPA. In this opinion, "EPA" will refer to all the defendants collectively, unless otherwise specified.

**2.** *See, In re: Chemical Waste Management, Inc. (Denver-Arapahoe Facility), RCRA (3008) Appeal No. 84–8 September 7, 1984.*

issuance of a permit. Recognizing the length and complexity of the approval process, Congress provided in Section 3005(e) of the Act that certain pre-existing facilities could continue to operate pending final decision by the EPA on their permit applications. RCRA § 3005(e), 42 U.S.C. 6925(e). This statutorily conferred authorization to operate pending issuance of a permit is known as "interim status". The Denver-Arapahoe hazardous waste facility run by CWM is such an interim status facility.

To obtain interim status, a waste facility must meet the safety standards codified at 40 C.F.R. Part 265. Two provisions of those regulations are directly at issue in this case. The first, 40 C.F.R. § 265.15(a), requires regularly scheduled inspection, record-keeping, and, if necessary, remedial action by the waste facility owner or operator. The waste facility owner or operator must routinely inspect the facility for:

> malfunctions and deterioration, operator errors, and discharges which may be causing—or may lead to (1) release of hazardous waste constituents to the environment or (2) a threat to human health. The owner or operator must conduct these inspections often enough to identify problems in time to correct them before they harm human health or the environment. 40 C.F.R. § 245.15(a).

Subsection (c) of the same regulation provides that the operator.

> must remedy any deterioration or malfunction of the equipment or structures which the inspection reveals on a schedule which ensures that the problem does not lead to an environmental or human health hazard. Where a hazard is imminent or has already occurred, remedial action must be taken immediately. 40 C.F.R. § 245.15(c).

Finally, subsection (d) mandates that the operator:

record inspection in an inspection log or summary. He must keep these records for at least three years from the date and time of the inspection. At a minimum, these records must include the date and time of the inspection, the name of the inspector, a notation of the observations made, and the date and nature of any repairs or other remedial actions. 40 C.F.R. § 245.15(d).

The second set of general requirements for an interim status facility at issue in this case requires the owner or operator of the facility to install what are known as monitoring wells. These monitoring wells are designed to determine what impact the waste facility has on the surrounding area's groundwater and whether any of the hazardous waste is contaminating the area's water supply. More specifically, the regulation requires the owner or operator of the waste facility to provide:

> monitoring wells (at least three) installed hydraulically downgradient (i.e., in the direction of decreasing static head) at the limit of the waste management area. Their number, locations, and depths must ensure that they immediately detect any statistically significant amounts of hazardous wastes or hazardous waste constituents that migrate from the waste management area to the uppermost aquifer. 40 C.F.R. § 265.91(a)(2).[3]

## II. The Reporting and Remedial Action Requirement Violations

The lengthy historical and procedural background of this case is set forth in full in the administrative record. While it is not necessary to repeat the entire progression of events in detail, a summary of the relevant facts which triggered the EPA's action against CWM is in order.

CWM operates the hazardous waste treatment facility known as Denver-Arapa-

---

**3.** An aquifer is an underground formation containing enough water to yield significant amounts of groundwater to a well or a spring. 40 C.F.R. 260.10. Downgradient refers to the direction in which this underground water flows, and is roughly analogous to downstream

for surface water. The waste management area is defined by an imaginary boundry line which circumscribes all of the hazardous waste management units at a facility. 40 C.F.R. 265.-91(b)(2).

hoe, which is owned by the City and County of Denver. The Denver-Arapahoe facility, constructed in 1980 under CWM's direction, is located approximately 15 miles east of downtown Denver. The hazardous waste management activities conducted by CWM at Denver-Arapahoe include the operation of three surface impoundments, or evaporation ponds, known as Ponds 1, 2, and 3. The ponds were built to store and treat liquid hazardous wastes by the process of evaporation. CWM also operates a drum burial cell at Denver-Arapahoe, designed for the disposal of containers filled with hazardous waste in a more solid form.

Each of the evaporation ponds is constructed of an individual five foot thick upper liner composed of compacted clay and designed to retain liquid. Below the three ponds is a common bottom liner, also five feet thick and composed of the same type clay. The upper and lower clay liners are separated by a 1.25 foot thick sand leachate collection layer, which drains into three individual sumps.[4] CWM installed pipes and three pumps in the collection layer so that if liquid penetrated the upper liner it would accumulate in the sand collection layer, drain into the sumps, and could be pumped up and out prior to a build up of pressure on the lower liner. Should any liquid penetrate the lower liner it would enter the environment.[5]

Pond 1 was filled with hazardous waste by CWM almost immediately after construction was complete. Pond 2 remained empty for eight months. Pond 3 was filled within six months. Other than a layer of protective soil which was placed over the exposed surface of the ponds, they remained exposed to natural forces, such as the weather, before they were filled with liquid.

On July 16, 1981, three months after Pond 2 was filled with hazardous waste, a CWM employee assigned to install locks on the sumps to the leachate collection system at the evaporation ponds, observed the presence of liquid in the Pond 2 sump. The CWM employee in charge of inspecting the sumps was notified of this finding and concluded that the presence of liquid in the sump indicated a possible leak in the upper liner of Pond 2. CWM sampled the fluids in the sump and in Pond 2 but the tests proved inconclusive as to the source of the liquid.

After discussions among various CWM personnel, including the manager of CWM's Environmental Management Department and CWM's regulatory attorney, a decision was made by CWM not to record the discovery of the liquid in the company's RCRA inspection log, which CWM was required to keep by federal law,[6] nor to volunteer any information about the situation to the EPA or the Colorado Department of Health. Instead, CWM recorded the information regarding the "leak" in a separate log which the EPA did not have access. CWM then deleted the sump inspection requirement from its original groundwater monitoring plan and wrote "NO LEAKS" in the RCRA inspection log for the evaporation ponds.

CWM entered into contracts with several outside consultants to study the source of the liquid in the Pond 2 sump and its potential for release into the environment. While these studies were being done, CWM pumped the accumulating liquid out of the Pond 2 sump. At one point, liquid accumulated in the sump at the rate of 200 gallons per day. Between July of 1981 and Janu-

---

4. Leachate is the liquid which escapes the upper liner. The leachate collection system operates as a non-segregated single unit underlying the individual upper liners of all three evaporation ponds. Fluids which leak through any one of the upper liners would enter the leachate system, and since it is a non-segregated single unit, could filter from there into any one or more of the three sumps.

5. The 1980 regulations contain no specific thickness requirement for surface impoundment liners, nor do they require double liner systems or leachate collection systems. CWM's surface impoundments were more sophisticated than necessary to meet the requirements of the RCRA regulations in effect in 1980 at the time of their construction.

6. 40 C.F.R. § 245.15(d).

ary of 1983, CWM pumped over 22,000 gallons of liquid out of the sump.

At no time prior to the filing of EPA's administrative complaint did CWM record in its RCRA inspection log either the presence of liquid in the Pond 2 sump or that CWM arranged for studies to be done to determine the source of the liquid or the continual pumping necessary to alleviate the problem. Indeed, it was not until a Colorado Department of Health inspector, during the course of a routine inspection in September 1981, discovered liquid in the Pond 2 sump that EPA was notified. Thus, more than a year had passed from the time CWM initially discovered the "leak" and began taking remedial action until either agency was made aware of the situation.

In October 1982, at the request of the EPA and the Colorado Department of Health, CWM drained Pond 2. Samples of the hazardous waste in Ponds 1 and 3 and the liquid in the sump were analyzed by the EPA.[7] A comparison of the levels of bromide and bromide-chloride ratios of the liquids led the EPA to conclude that the hazardous waste in the evaporation ponds was almost certainly the source of the liquid accumulating in the Pond 2 sump. Thereafter, the EPA issued an administrative complaint against CWM for violations of § 245 imposing a separate civil penalty for each violation.[8]

### III. *The Misplacement of the Monitoring Wells*

The regulations governing operation of hazardous waste facilities under interim status clearly require the placement of at least three monitoring wells at the hydraulic downgradient limit or perimeter of a waste containment area.[9] 40 C.F.R. § 265.-91(a)(2). Consultants with whom CWM conferred during the construction process of Denver-Arapahoe advised CWM that placement of wells at the boundary of the waste management area might not, in their judgment, detect the movement of escaping hazardous wastes. Instead, they recommended the installation of wells at sites other than at the regulation sites. CWM acted upon the consultants' recommendations and installed six wells at the recommended sites and none at the regulatory sites. As a result, the wells were not at the perimeter of either the evaporation ponds or the drum burial cell. The closest of the three wells at the pond area was 200 to 250 feet away from the nearest pond, and the next nearest was 400 to 500 feet away. The wells at the drum burial cell site ranged from 40 feet to 125 feet from the edge of the drum burial.

The Denver-Arapahoe facility is located on the site of the former Lowry Landfill, a disposal facility for municipal and hazardous waste which was run by the City and County of Denver. Landfill units formerly used for disposal of industrial and municipal waste are located at what is known as Section 6 of the site. EPA was aware of CWM's plans with regard to the location of monitoring wells in Section 6 as early as 1980. No objection was made by the EPA to these plans at that time. The EPA employees who were involved with discussions concerning Section 6, however, were from the Agency's separate "Superfund" program. No review was made of CWM's plans for compliance with RCRA monitoring well regulations until the middle of 1982.

At that time, the EPA began to review the Denver-Arapahoe plans for compliance

---

7. EPA sampled Ponds 1 and 3 because Pond 2 had already been drained. The waste in Pond 2, however, consisted of a mixture of the waste in Ponds 1 and 3.

8. The original complaint contained four separate counts. The Agency requested a separate civil penalty and compliance action for each. Count IV, concerning the facility's emergency contingency plan, was completely settled by the parties prior to the EPA's initial decision. Compliance actions relating to the remaining three violations were also agreed to by the parties. *See, Partial Consent Agreement, EPA ID No. COD00695007 April 2, 1984.*

9. The hydraulic downgradient limit or perimeter of the waste containment area is described by an imaginary boundry line which circumscribes the several waste management components. 40 C.F.R. § 265.91(b)(2).

with the RCRA. As part of the review, the EPA employed an outside consulting firm to review the material submitted by CWM to the EPA. A draft report made by the consultants dated September 1982 indicated that one of the wells at the ponds appeared to be too far away from the pond. The report made no other comments concerning the location of the wells.

The administrative complaint issued by the EPA against CWM in January 1983 included a violation of RCRA § 265 based on CWM's misplacement of its monitoring wells at Denver-Arapahoe, in addition to the other above described violations.

## ADMINISTRATIVE PROCEEDINGS

On January 21, 1983, the EPA filed an administrative complaint against CWM for violations of RCRA and EPA's implementing regulations. CWM was charged in Count I with violating 40 C.F.R. § 265.15 by failing to record either the presence of liquid in the evaporation pond sump, or the remedial action taken by CWM, in the RCRA inspection log CWM was required to maintain. CWM was charged in Count II with violating the same regulation by failing to take remedial action according to a schedule which would ensure that the condition would not endanger human health or the environment. Count III charged CWM with a violation of 40 C.F.R. § 265.91(a)(2) based on improper placement of the monitoring wells.[10]

The complaint proposed to assess civil administrative penalties, under Section 3008(c) of the RCRA, 42 U.S.C. § 6928(c), of $25,000 for Count I, $11,000 for Count II, and $11,000 for Count III—a total of $47,000. The complaint included notice of CWM's statutory right to an adjudicatory hearing.

CWM contested the complaint and, following discovery, the matter was tried on October 5–7, 1983, before an ALJ. The ALJ ruled in EPA's favor on all three counts in his Initial Decision of February 22, 1984, but decreased the amount of the penalty to $40,000. In addition, a compliance order was issued by the ALJ.

CWM exercised its right of appeal to the Chief Judicial Officer (CJO) of the EPA. The CJO affirmed the initial decision of the ALJ on September 5, 1984, and incorporated by reference the ALJ's findings of fact, conclusions of law, and reasons therefore.

While CWM's administrative appeal was pending, CWM and EPA executed an agreement settling all matters related to compliance. The CJO therefore struck the ALJ's compliance order from the initial decision and ordered the parties instead to abide by the terms and conditions of their executed settlement. The affirmance by the CJO of the ALJ's decision became the final agency action in the case. CWM filed suit in this Court seeking review of the EPA's decision. The EPA has counterclaimed for payment of the $40,000 penalty plus pre-judgment and post-judgment interest.

## DISCUSSION

The RCRA expressly provides for a public hearing upon the request of a party against whom a compliance order is served for a violation of any requirement of the RCRA. Since a full adversary hearing on the record was held by the Agency in this case, CWM and EPA agree that this Court's review of the EPA's action is governed by Section 10(2)(E) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(E). That section of the A.P.A. provides:

The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be ...

(E) unsupported by substantial evidence ...

This court may set aside the EPA's factual findings only if they are unsupported

---

10. As originally filed, Count III also alleged improper placement of the upgradient well, and other technical deficiencies for the downgradient wells. EPA subsequently amended its complaint to drop these allegations. The complaint also included a fourth count on which the EPA and CWM reached a settlement.

by substantial evidence. Substantial evidence need not be overwhelming. "A factual finding is supported by substantial evidence if the record contains such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Japan Airlines Co., Ltd. v. Dole*, 801 F.2d 483 (D.C.Cir.1986); *American Financial Services Assoc. v. FTC*, 767 F.2d 957, 985 (D.C.Cir.1985); *American Textile Mfrs. Inst. Inc. v. Donovan*, 452 U.S. 490, 495, 522, 101 S.Ct. 2478, 2483, 2497, 69 L.Ed.2d 185 (1981).

After a careful review of the administrative record, this court finds that there is substantial evidence to support the factual findings of the ALJ as affirmed by the CJO. The parties to this suit do not dispute the events which took place at the Denver-Arapahoe facility. Both sides agree that the chronology of events as described in section II and III above, and as found by the ALJ and CJO is accurate. CWM's position is that those facts were not sufficient to trigger the reporting or remedial action requirement of the regulations at issue which CWM was found to have violated. Nor does either party dispute the actual location of the wells. Rather, CWM contends that the location chosen for the wells was necessary based on CWM's reading of the applicable regulations.

Both the EPA and CWM entitle the arguments made in their supporting memoranda as addressing the substantial evidence test described above. The actual arguments made by both parties, however, address the appropriateness of the EPA's interpretation of the applicable regulations to the facts of this case. The parties do not dispute the facts underlying the application of the regulations. Accordingly, this court must assess whether the EPA's interpretation and application of the regulations were proper, or whether they were arbitrary, capricious or contrary to law.[11]

"To decide whether an agency's action is arbitrary or capricious 'the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *American Financial Services*, 767 F.2d 985 (quoting *Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). The arbitrary and capricious standard of review is a highly deferential one which presumes that the agencies actions are valid. *Environmental Defense Fund v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981). The burden of overcoming this presumption is upon the party challenging the agency action. *Mt. Airy Refining Co. v. Schlesinger*, 481 F.Supp. 257, 264 (D.D.C.1979) citing *Udall v. Washington and Virginia Coach Co.*, 398 F.2d 765 (D.C.Cir.1968).

This court finds the EPA's interpretation of the relevant regulations reasonable and in accord with the purpose of the RCRA. CWM's position with regard to the reporting requirement of section 245.15(d) is that not only must there be a malfunction or deterioration at the facility, but that "absent a malfunction or deterioration that could lead to a release there can be no violation of the requirement to note those conditions in a log book; nor can there be a violation of the requirement to remedy the malfunction or deterioration, since that obligation only exists for incidents subject to the recordkeeping requirement."[12] Plaintiff's Reply to Defendant's Memo at 7. The flaw in CWM's reasoning is apparent when one examines the language of section 245.15(d), and the purpose of the regulations at issue.

Section 245.15 has four subsections. Section 245.15(a) describes to the operator what sort of malfunctions or deteriorations to look for when undertaking an inspection

11. The arbitrary and capricious standard is generally used by a court reviewing agency action other than factual findings. *See* 5 U.S.C. § 706(2)(A); *American Financial Services*, at 985.

12. Under CWM's interpretation, unless the EPA proves that the liquid in the collection layer and sump would enter the environment, CWM has no duty to report it at all.

of the facility; namely, those malfunctions or deteriorations which may cause or may lead to a release into the environment or a threat to human health. Thus, for example, a broken drawer in an office desk at the facility, is not the sort of malfunction that would be required by the regulation to be regularly inspected for. Such malfunctions are of the sort which could never lead to a release or threat to human health, even if allowed to go unremedied.

Section 245.15(b) is a scheduling mandate which requires the operator to conduct the inspections on a regular basis, allowing some discretion as to the frequency of those inspections based on the inherent useful life of the various component parts of the facility being inspected. Section 245.15 tells the operator that when a deterioration or malfunction of the type described in subsection (a) *is* discovered, it must be remedied before it becomes hazardous.

Finally, subsection (d), which CWM violated, instructs the operator to record certain types of information in the RCRA log book where the inspection takes place. That information must include "at a minimum ... the date ... time ... a *notation of the observations made....*" (emphasis added). No mention is made here, as it is in subsection (a), that only those malfunctions or deteriorations which may lead to or cause a release must be recorded, yet that is CWM's proferred interpretation.

The EPA, contrary to CWM, does not read this last section to mean that only those observations for which there is a likelihood of release into the environment based on probative evidence, must be recorded in the log; nor does it interpret it to mean, as CWM suggests, that an alternative interpretation would mean that "the logs would have to be filled with notes on birds and bees." (Plaintiff's memorandum in support of motion for judgment on the record at 22).

While a judgment must be made by the inspector as to what kind of observation is to be recorded, there are certain types of circumstances which common sense dictates is the kind the EPA intended an inspector to record in the RCRA log when this regulation was promulgated. Certainly, 200 gallons of unidentified liquid accumulated in a given day, from an unidentified source, which has entered an area within the middle layer of a hazardous waste treatment unit (where the expected rate of seepage was five gallons according to the operator of that unit) seems to be such an observation. A smaller amount of liquid which accumulates consistently over a period of time would also reasonably be required to be recorded. CWM was, after all, concerned enough about the presence of the liquid that it went to the expense of hiring outside consultants to study the problem.

In this case, not only did CWM fail to record this type of observation, or the steps it took to remedy the leak, such as the necessity of continual pumping or the studies made, but CWM deliberately chose not to disclose this information to the EPA by altering their RCRA inspection schedule and starting a second log to be used to keep track of their activities. CWM's actions clearly violate the regulations as have been found. They may also indicate bad faith and willful non-compliance by CWM.

■ With regard to the monitoring wells, CWM contends that their choice of placement was more likely to detect seepage of hazardous waste than placement of wells immediately at the perimeter of the waste management unit and was therefore a safer choice of location than that required by the regulations. We find this argument also to be without merit, as the regulations require only a *minimum* of three wells to be at the perimeter of the waste management units and CWM was free to install additional wells where ever they thought best. Indeed, the EPA foresaw this very possibility and expressly noted that in certain cases more than three wells might be required. 45 Fed.Reg. 33192 (May 19, 1980).

■ Plaintiff's further contention is that the EPA's interpretation of the regulations

in question in some way violated their constitutional right to due process of the law by failing to give adequate notice of the activity required by plaintiff to avoid a violation of the regulation. We find this argument to be without merit. ·The required activity mandated by the regulation is clear from the plain language of the regulations. It is CWM's proposed reading of the regulations which is strained and lends ambiguity to their meaning.

When the EPA's interpretation of the regulations is examined in light of the policy of the RCRA, it is clear that the EPA's actions were reasonable and in accordance with the statutory purposes of the RCRA. Accordingly, this Court must defer to that interpretation and uphold the EPA's decision.

The potential for harm as a result of an accidental release of hazardous waste from Denver-Arapahoe, or any hazardous waste treatment facility, is great. This is especially true when such a facility is located within such close proximity to a major metropolitan area as Denver. When one compares this risk to the burden the requirements of recording and proper placement of the wells places on the operator of a facility, the reasonableness of the EPA's actions is greater still. The simple act of making an entry into a log so as to notify the EPA of the recent events, which was done anyway by CWM in a separate log, could potentially prevent an environmental and human health disaster.

■ CWM also complains of the inappropriateness of the fines imposed by the EPA. Section 3008 of the RCRA authorizes a fine of $25,000 for each day of non-compliance with the applicable regulations. Given that CWM violated those regulations for over a year and a half, the EPA has the statutory authority to fine CWM for over thirty million dollars. In light of the foregoing, the forty thousand dollar fine assessed is, if anything, too lenient, and this court grants defendants' motion for summary judgment on their counterclaim. Defendants seek both prejudgment and post-judgment interest on the $40,000 fine assessed and reimbursement for court costs. After consideration of the factors presented in the parties supporting and opposing memoranda, this court agrees that defendants' request should be granted.

Based on the above considerations, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted. An Order consistent with this Memorandum Opinion will be entered this date.